UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

RONALD W. MORTON, JR.,  )
                        )
            Plaintiff,  )
                        )
       v.               )     No. 1:12 CV 175 ERW / DDN
                        )
MICHAEL ASTRUE,         )
Commissioner of Social Security )
                        )
            Defendant.  )

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Ronald W. Morton, Jr., for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b).

For the reasons set forth below, the undersigned recommends that the decision of the Administrative Law Judge be affirmed.

## I. BACKGROUND

Plaintiff Ronald W. Morton, Jr., born on September 25, 1965, filed applications for Title II and Title XVI benefits on November 9, 2009. (Tr. 168-77.) He alleged an onset date of disability of June 15, 2007, due to hip, leg, and lower back pain, asthma, diabetes, and neuropathy in both legs. (Tr. 216.) Plaintiff's applications were denied initially on January 28, 2010, and he requested a hearing before an ALJ. (Tr. 95-102.)

On August 10, 2011, following a hearing, the ALJ found plaintiff not disabled. (Tr. 36-43.) On August 28, 2012 the Appeals Council denied plaintiff's request for review. (Tr. 1-4.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

On October 23, 1984, plaintiff complained that he injured his lower back by lifting brake drums. (Tr. 410-11.)

On August 11, 1988, plaintiff complained that he injured his lower back by lifting boards. R.L. Wells, M.D., of Methodist Health Care Centers, diagnosed spondylolisthesis.[1] (Tr. 403-04.)

On August 23, 1988, John K. Schneider, M.D., of Methodist Health Care Centers examined plaintiff. Plaintiff rated his job performance as a mechanic and stated that he experienced no back pain, except when heavy lifting. X-rays showed Grade I spondylolisthesis with spina bifida occulta.[2] Dr. Schneider instructed plaintiff to avoid heavy physical labor. (Tr. 405.)

On September 6, 1989, plaintiff received lumbo-sacral x-rays at the Occupational Health Center of Methodist Health Care Centers that indicated plaintiff had spondylolisthesis and spondylolysis at L5-SI.[3] The physician found the X-ray results insignificant. He further indicated that plaintiff's physical condition did not prevent him from working at Southside Landfill. (Tr. 396-98.)

On June 7, 1991, plaintiff was examined at the Occupational Health Center of Methodist Health Care Centers. A pulmonary function test revealed mild obstructive pattern. Plaintiff reported that he smoked one pack of cigarettes per day and was advised to quit smoking. The

---

[1] Spondylolisthesis is forward movement of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum. Stedman's Medical Dictionary 1813 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

[2] Spina bifida is the embryologic failure of fusion of one or more vertebral arches. Stedman at 1805. Spina bifida occulta is spina bifida with a spinal defect but no protrusion of the cord or its membrane. Id.

[3] Spondylolysis is marked by deficient development of a portion of the vertebrae. Stedman at 1813.

physician indicated that plaintiff's physical condition did not prevent him from working. (Tr. 382-87.)

On June 2, 2000, plaintiff was examined by Louis J. Angelicchio, M.D., of the Sports Medicine Institute of Indiana, apparently for a workers compensation claim. Dr. Angelicchio's report is entirely as follows:

> Ron returns and right knee has improved, although he has plateaued in work conditioning. Under the circumstances, I feel this gentleman is at maximum medical improvement. **He is returned to work 06/02/2000 with restrictions. No lifting or carrying greater than 60 pounds and no squatting, climbing, kneeling, or uneven surfaces for prolonged periods of time. Also, this gentleman may benefit from a neoprene palumbo type knee sleeve.** Ron is released from my care today. I will be happy to see him back on an as-needed basis. Ron is at maximum medical improvement. He rates a 10% PPI rating to the right lower extremity as relates to his right knee pathology and mild loss of motion. A 10% PPI rating to the right lower extremity translates to a 4% PPI rating for the whole person. (Tr. 296.)

On May 11, 2005, Community Health Network Hospital in Indiana admitted plaintiff following an altercation with his brother. Plaintiff reported suicidal and homicidal ideations and access to multiple guns. Plaintiff also reported headaches, chest pains, and lack of sleep, and was worried, irritable, crying, and experiencing racing thoughts. He further reported unemployment and drinking three to four beers per day and one or two marijuana joints per day. Plaintiff was found to have poor concentration, agitation, depression, and to be tearful. Plaintiff's risk assessment clinical summary indicated he was at a high risk of harming himself and others. The physician assessed intermittent explosive disorder, major depressive disorder, and a GAF score of 52.[4] He received recommendations to attend group therapy to learn skills to control his negative emotions, and improve judgment and cognition. (Tr. 456-58.)

On September 13, 2005, plaintiff appeared for a follow-up examination at Community Health Network Hospital. He reported working part-time and was determined to be "alert,

---

[4] On the GAF scale, a score of 52 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 32-34 (4th ed. 2000) (DSM).

oriented, and coherent" and to have an improved state of well-being since he learned he had diabetes. He had mild lability and worried about his financial situation.[5] Plaintiff was prescribed Seroquel.[6] Plaintiff was diagnosed with diabetes. (Tr. 460.)

On October 20, 2005, plaintiff appeared for his second follow-up examination at Community Health Network Hospital. Plaintiff had stopped taking Prozac and disliked the Seroquel because it made him feel "funny."[7] Plaintiff continued to experience sleeping problems, for which he was prescribed Ambien.[8] He was diagnosed with diabetes and asthma. (Tr. 459.)

On January 5, 2006, plaintiff withdrew from psychiatric treatment. (Tr. 455.)

On March 10, 2006, in response to a request of the Missouri Department of Social Services, Family Support Division, a physician noted that plaintiff's chief complaints included pain in his hip, lower back, and feet. He was diagnosed with diabetes mellitus, neuropathy, and low back and hip pain. (Tr. 290-91.)

On June 12, 2006, nurse June Taylor indicated that plaintiff failed to complete diabetes self-management training. (Tr. 265.)

On November 18, 2006, plaintiff arrived at Wishard Memorial Hospital and complained of right arm pain and erythema. Plaintiff was diagnosed with cellulitis and discharged on November 21, 2006.[9] (Tr. 266-78.)

On May 16, 2008, plaintiff sought medical treatment at Sikeston Family Clinic. He informed William B. Bradley, MSN, FNP, that he recently experienced head trauma for which he had been admitted to the emergency room at Saint Francis Hospital. Mr. Bradley noted that

---

[5] Lability denotes the state of having a free and uncontrolled moor or behavioral expression of the emotions. Stedman at 1037.

[6] Seroquel is an anti-psychotic drug used to treat certain mental/mood conditions. WebMD, http://www.webmd.com/drugs.

[7] Prozac is used to treat depression, panic attacks, obsessive compulsive disorder bulimia, and a severe form of premenstrual syndrome. WebMD, http://www.webmd.com/.

[8] Ambien is used to treat sleep problems in adults. WebMD, http://www.webmd.com/.

[9] Cellulitis is marked by subcutaneous inflammation and loose connective tissue. Stedman at 343.

plaintiff had a history of diabetes and hypertension, and expressed concern with plaintiff's smoking and history of asthma, as well as his likely chronic obstructive pulmonary disease (COPD), cough, congestion, fatigue, and weight gain. Mr. Bradley also noted that plaintiff had received no insulin for six months and drank alcohol on occasion. Plaintiff also reported that he had not worked since June 2007. Mr. Bradley assessed hypertension, hypercholesterolemia, type 2 diabetes with peripheral neuropathy, COPD, asthma, and erectile dysfunction. Mr. Bradley also noted that plaintiff's chart listed the following medicines: Pravachol, Metformin, Aspirin, B-complex, Levitra, Claritin, Nasacort AQ, Advair, and DuoNeb.[10] He instructed plaintiff to return in two weeks with a blood sugar log. (Tr. 303.)

On June 2, 2008, plaintiff visited the Sikeston Family Clinic for evaluation. Jyoti Kulkarni, M.D., noted plaintiff's current method of orally ingesting insulin, but plaintiff reported previous use of Hurnalog and Lantus. Plaintiff's glucose level was around 297. Plaintiff used DuoNeb at least twice per day but continued to smoke. He also requested refills for his Nasacourt. Dr. Kulkarni directed plaintiff to continue Advair and DuoNeb on an as needed basis, and prescribed Avandamet and Nasacort.[11] Dr. Kulkarni also directed plaintiff to monitor his diet and prescribed Chantix to help him quit smoking. He was diagnosed COPD, type 2 diabetes, and chronic rhinitis.[12] (Tr. 302.)

---

[10] Pravachol is used to reduce the amount of cholesterol produced by the liver. WebMD, http://www.webmd.com/drugs. Metformin is used to control high blood insulin and by reducing the amount of sugar made by the liver and absorbed by the stomach/intestine. Id. B-complex is a combination of B vitamins used to treat or prevent vitamin deficiency caused by poor diet, certain illnesses, alcoholism, or during pregnancy. Id. Levitra treats male sexual function problems. Id. Claritin is an antihistamine that treats itching, runny nose, watery eyes, sneezing from "hay fever," and other allergies. Id. Nasacort is used to treat allergy symptoms by reducing swelling in the nasal passages. Id. Advair is used to control and prevent symptoms caused by asthma or ongoing lung disease. Id. DuoNeb is used to treat and prevent symptoms caused by ongoing lung disease. Id.

[11] Avandamet is used, along with proper diet and exercise, to control high blood pressure in individuals with type 2 diabetes. WebMD, http://www.webmd.com/.

[12] Rhinitis is inflammation of the nasal mucous membrane. Stedman at 1690.

On June 12, 2008, Patrick J. Lecorps, M.D., evaluated plaintiff at the request of the Department of Family Services, due to a complaint of low back and bilateral hip pain. Plaintiff reported that he had suffered pain for the past two years, that he had trouble falling asleep, and that he took no medication. Plaintiff rated the pain as an 8 of 10. Dr. Lecorps noted that plaintiff was able to bend over and touch his toes and that hyperextension of the lumbosacral spine and lateral flexion on the right and left side was normal. Plaintiff complained of pain in both of his hips, but stated that the right hip hurt more than the left. X-rays of both hips showed that plaintiff's hip joints were normal, without evidence of osteoarthritic changes. Dr. Lecorps noted a calcification in the middle of the femoral head on the left hip but found it of no clinical importance. X-rays of the lumbosacral spine showed a narrowing of the joint space at L4-L5 and L5-S1 typical of degenerative disc disease, as well as a narrowing of the foramen.[13] Dr. Lecorps found no evidence of spondylolysis or spondylolisthesis. (Tr. 295.)

On June 23, 2008, plaintiff was seen by Dr. Kulkarni at the Sikeston Family Clinic for evaluation. Plaintiff stated that his Avandia medication caused him stomach discomfort, and that he did not like the effect of the DuoNeb.[14] Plaintiff further stated that he was unable to check his glucose levels because he did not have any test strips. Plaintiff continued to smoke cigarettes, and felt fatigued and tired. He also reported nebulizer treatment twice per day. (Tr. 301.)

On June 23, 2008, Deborah McWilliams submitted a Physical Residual Functional Capacity Assessment regarding plaintiff. Ms. McWilliams found that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour workday; and sit (with normal breaks) about 6 hours in an 8-hour workday.

---

[13] The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman at 226, 831, 1376, 1549, 1710, Plate 2.

[14] Avandia is used by persons with type 2 diabetes to control high blood sugar. WebMD, http://www.webmd.com/drugs.

Plaintiff stated he had difficulty sitting, standing, or climbing for long periods of time. He also reported being able to undertake household chores and shop for groceries once a week for forty-five minutes to one hour; however, he could not undertake yard work. Plaintiff further reported driving and fishing occasionally. Ms. McWilliams found plaintiff's allegations regarding his difficulty sitting, standing, or climbing for long periods partially credible, noting plaintiff had no significant impairment that substantially limited him. She concluded that plaintiff had an established impairment, but determined that his exertional limitations were appropriate, based on his reported activities and limited findings. (Tr. 75-80.)

On July 18, 2008, plaintiff was seen by Mr. Bradley at the Sikeston Family Clinic, complaining of headaches and uncontrolled blood sugar. Mr. Bradley indicated the cost of medication as a significant issue. Plaintiff continued to smoke cigarettes. Mr. Bradley prescribed Pristiq for depression and obsessive-compulsive disorder. (Tr. 300.)

On August 28, 2008, plaintiff was seen by Dr. Kulkarni at the Sikeston Family Clinic. Plaintiff continued to smoke cigarettes. Plaintiff denied experiencing wheezing, chest tightness, or shortness of breath; hypo- or hyperglycemic symptoms; or fatigue or tiredness. Plaintiff reported that the Pristiq improved his mood and that his symptoms were more stable. Plaintiff also reported back pain, and Dr. Kulkarni diagnosed chronic pain. (Tr. 299.)

On October 7, 2008, plaintiff was seen by Tina Moore, FNP-BC, at the Sikeston Family Clinic for diabetes and to refill medications. He reported that he had exhausted some of his medications. Plaintiff's past medical history included OCD, anxiety, arthritis, degenerative disc disease, erectile dysfunction, COPD, asthma, and hypertension. Plaintiff reported smoking one and a half to two packs of cigarettes per day for 28 years and drinking one case of beer per week. Plaintiff's lungs were coarse throughout. Ms. Moore reported that plaintiff's heart rate and rhythm were regular – there were no clicks, murmurs, or rubs. Ms. Moore assessed COPD, asthma, hypertension, OCD, diabetes mellitus, allergic rhinitis, arthritis, and degenerative disc disease. (Tr. 297-98.)

On December 4, 2008, plaintiff was again seen by Ms. Moore. He complained of pain in his legs and reported that he had been without medication for two months due to financial difficulties. Ms. Moore assessed diabetes mellitus, COPD, and erectile dysfunction. Ms. Moore

also noted that, despite her encouragement, plaintiff refused to go to the emergency room due to lack of insurance. Ms. Moore also filled out a hunting method exemption form to allow plaintiff to hunt from a stationary vehicle and with a crossbow/draw locking device. Specifically, she indicated that plaintiff could not ambulate without an assistive device and that plaintiff suffered a torn rotator cuff and muscle atrophy in his right arm. (Tr. 322.)

On January 7, 2009, plaintiff underwent a pulmonary function test. Leo Neu, Jr., M.D., reported constant wheezing, a history of exposure to asbestos for six and a half years and paint fumes and solvents for twelve years, and that plaintiff smoked one and a half packs of cigarettes a day for the past twenty-eight years. Dr. Neu diagnosed moderate obstructive airway disease, and instructed plaintiff to resume all previously scheduled respiratory medications. (Tr. 308.)

On January 12, 2009, plaintiff saw Ms. Moore, complaining of a phlegm-inducing cough, and seeking a checkup and medication. He had experienced the cough for two to three weeks, and agreed to follow up in three months or sooner if it persisted. Ms. Moore assessed acute bronchitis, diabetes, chronic airway obstruction, and hypertension. She reported that the clinic would attempt to acquire affordable medication for plaintiff. She instructed plaintiff to check his blood sugar three times per day. (Tr. 321.)

On April 13, 2009, plaintiff complained to Ms. Moore about a burning sensation in his legs that he experienced at night and stress due to his mother's illness and recent breakup. Ms. Moore reported that plaintiff was without edema, had no lesions on his feet, and had strong pulses. Plaintiff also had decreased sensitivity in his left leg from the knee down and his right leg from the middle of the shin down. He took insulin the morning of his examination with Ms. Moore, but had forgotten to take his long-acting insulin the night before. (Tr. 319-20.)

On August 10, 2009, plaintiff was seen by Mr. Bradley. Mr. Bradley noted that plaintiff was not consistent with his insulin and that he continued to smoke cigarettes. Mr. Bradley also noted plaintiff had multiple symptoms of depression and very poor sensation in the toes. Mr. Bradley assessed uncontrolled type 2 diabetes, hypercholesterolernia, hypertension, and depression and prescribed Cymbalta.[15] (Tr. 318.)

---

[15] Cymbalta is used for the treatment of anxiety and depression. WebMD, http://www.webmd.com/drugs.

On November, 13, 2009, plaintiff saw Michael R. Butner for diabetes. Plaintiff had not taken any medication for about six weeks. He continued to smoke cigarettes. Mr. Butner assessed uncontrolled diabetic autonomic neuropathy and polyneuropathy. Plaintiff agreed to begin checking his blood sugar again and to return for reexamination in one week. (Tr. 364-67.)

On December 17, 2009, plaintiff saw Karen Tracy, FNP, for diabetes. Ms. Tracy assessed poorly controlled diabetes mellitus and polyneuropathy. Plaintiff was instructed to return for reexamination in four weeks. (Tr. 337-38.)

On January 5, 2010, Christy A. Parker submitted a Physical Residual Functional Capacity Assessment regarding plaintiff. Ms. Parker found that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk at least 2 hours in an 8-hour workday; sit (with normal breaks) about 6 hours in an 8-hour workday; and was limited in his ability push and/or pull by his lower extremities. She reported plaintiff could occasionally climb and balance, and had to avoid concentrated exposure to hazards, such as machinery and heights. Plaintiff complained of diabetes, asthma, back, legs, and hip pain, and neuropathy. Ms. Parker found plaintiff's impairments could reasonably have caused his symptoms and functional limitations. She reported that although his impairments were not disabling, his allegations were credible. (Tr. 84-89.)

On January 24, 2010, plaintiff saw Ms. Tracy for diabetes. She reported his lungs were coarse throughout. She assessed acute sinusitis and poorly controlled diabetes mellitus. She and plaintiff agreed to a follow-up examination in two weeks. (Tr. 336-37.)

On January 28, 2010, Gretchen Brandhorst, Psy.D., submitted a Psychiatric Review Technique regarding plaintiff after reviewing his records. Dr. Brandhorst found that plaintiff suffered from depression, anxiety, and OCD. She further found,

> Claimant alleges physical impairments only. However, MER supports diagnoses of depression, anxiety, and OCD. Claimant is prescribed rx by his TP. There have been no ER visits or hospitalizations due to exacerbation of symptoms. There is also no real complaint of symptoms in file. ADL primarily reports physical limitations; however, claimant does mention problems with concentration and getting along with others. He is able to cook, clean, drive, shop, and he completed his own forms. Allegations are credible.

(Tr. 350.) She further found that plaintiff had mild difficulty maintaining social functioning, as well as concentration, persistence, or pace. As stated, she found that his allegations regarding his mental conditions were credible. Dr. Brandhorst concluded that, even crediting plaintiff's allegations, that his impairments were non-severe. (Tr. 340-50.)

On May 10, 2012, plaintiff saw Muhammad Salmanullah, M.D., for diabetes. Plaintiff complained of trouble sleeping and foot pain. Dr. Salmanullah assessed uncontrolled diabetic autonomic neuropathy and prescribed Elavil. (Tr. 355-57.)

On October 11, 2010, plaintiff saw Ms. Tracy for diabetes and medication refills. Ms. Tracy reported that plaintiff had not taken insulin in over six months. Plaintiff continued to smoke cigarettes and to consume alcohol heavily. Ms. Tracy reported that plaintiff did not exercise regularly and was obese. She further reported that plaintiff experienced decreased response to tactile stimulation in his leg and foot. She assessed acute sinusitis, chronic obstructive pulmonary disease, and poorly controlled diabetes mellitus. Plaintiff scheduled a follow-up examination in four weeks. (Tr. 351-55.)

On June 7, 2011, plaintiff saw Ms. Tracy for diabetes and allergies. Plaintiff did not exercise regularly and was obese. He continued to smoke cigarettes. Ms. Tracy assessed sinusitis, poorly controlled diabetes mellitus, chronic obstructive pulmonary disease, and organic impotence. (Tr. 372-76.)

**Testimony at the Hearing**

The ALJ conducted a hearing on June 10, 2011. (Tr. 48-70.) Plaintiff testified to the following. He is forty-five years old. He measures six feet and weighs 240 pounds. His last level of education completed was the twelfth grade. He lives with his 73-year-old mother. He is divorced. (Tr. 51-52, 55.)

He has primarily worked as a heavy equipment operator and crew supervisor for utility installation. He last worked as a supervisor of a five-man crew that installed water systems. He also read blueprints. He left the job in July 2007 due to stress, aggravation, and leg difficulties. Specifically, after he informed his employer that he could not supervise due to stress, his

employer laid him off. He has since applied for other work to obtain food stamps. (Tr. 52-53, 69.)

He is currently under the care of a physician. His major health problems consist of diabetes, neuropathy in the feet and legs, and degenerative disk disease. His medication for blood pressure and mental conditions cause dizziness. He cannot work as a heavy equipment operator due to his medication and cannot work as a foreman or supervisor due to stress. He can no longer hunt and fish anymore due to back and leg pain and difficulty breathing. (Tr. 53-55, 57.)

Plaintiff has no difficulties with personal hygiene except for bending over to wash his feet and legs. He does not wash dishes, sweep, mop, or cook, although he launders two loads of his clothes per week and changes his bed sheets. His brother mows his mother's lawn and carries the trash to the street. Although he has a driver's license, his brother drove him to the hearing. He drives about two miles her per week. He cannot drive long distances due to leg and back pain. Plaintiff shops for groceries with his mother once per month. Using small bags, he helps his mother carry the groceries to and from the vehicle. (Tr. 55-57.)

He experiences neck pain about twice a week. The pain lasts for about two or three hours, which he rates as a 5 of 10. Laying down increases the pain, but moving around alleviates it. He experiences shoulder pain two or three times a week that lasts for two hours, which he attributes to a torn rotator cuff. He rates the pain, which is tight and burning, as 6 of 10. He cannot bend his shoulder back but can raise it above his head. He has not received an X-ray or MRI due to inability to pay. Lifting heavy objects or reaching above his head exacerbates the pain. At his last job, he occasionally assisted with the setting of sewer castings and risers. (Tr. 58-60.)

He experiences a tight, burning pain in his lower back about four times per week. The pain lasts for four or five hours and is exacerbated by manual labor, including bending and lifting. Relaxation, heating pads, and Icy Hot alleviate the pain, but he receives no medication. He experiences steady, throbbing, aching pain in his left hip constantly. He also continues to experience pain in his right knee daily, which he attributes to a job-related injury that caused him to undergo four operations and physical therapy. He also experiences pain in both legs and feet daily due to neuropathy, which he first incurred three years earlier. His legs and feet feel as though they are asleep or as though he is walking on needles. He cannot sit or stand for more

than two hours, and often alternates positions.  He can walk only an average of a couple of city blocks.  He can only lift about 30 to 40 pounds with either hand.  (Tr. 60-63.)

On a typical day, plaintiff spends most of his time in his room watching television.  About half the time he lies down to remove pressure from his feet.  He also walks when his legs become stiff.  He can never sleep throughout the night.  For sleep, he currently takes Elavil, and has taken Tramadol and Trazodone.  After three or four hours of sleep he awakens due to a burning sensation in his feet and legs and rubs them to facilitate blood circulation.  He then has trouble falling back asleep.  (Tr. 63-65.)

During the last year, his condition has worsened.  He continues to experience leg pain due to neuropathy.  His vision has deteriorated, and he cannot read even with glasses on.  Due to his diabetes, he monitors his blood sugar four times per day and takes injections.  His blood sugar has been high as of late, and he has been alternating between injections and pills for treatment.  He does not eat often.  He does not belong to or attend any religious or civic organizations.  He does not visit with friends.  (Tr. 65-66.)

He suffers from anxiety and depression.  Cymbalta helps, but he continues to feel stressed and depressed.  His depression causes worry and pain, and he has crying spells.  He has never attempted suicide; however, he was hospitalized for one week in 2005 after expressing suicidal thoughts due to job-related stress.  While hospitalized, he was diagnosed with diabetes, informed that high blood sugar can cause mood swings, and prescribed Prozac and insulin.  He occasionally has difficulty with concentration and has long term memory problems.  With the financial support of his mother, he currently sees a physician for his mental health conditions.  He applied for a Medicaid card but did not qualify.  (Tr. 66-69.)

### III. DECISION OF THE ALJ

On August 10, 2011, the ALJ issued a decision that plaintiff was not disabled.  (Tr. 36-43.)  At Step One of the prescribed regulatory decision-making scheme,[16] the ALJ found that plaintiff had not engaged in substantial gainful activity since June 15, 2007, the alleged onset

---

[16] See below for explanation.

-12-

date. At Step Two, the ALJ found that plaintiff's severe impairments were diabetes mellitus, diabetic neuropathy, degenerative disc disease of the lumbar spine, and chronic obstructive pulmonary disease. (Tr. 38.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 39.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work, except he must avoid concentrated exposure to caustic or toxic chemicals. At Step Four, the ALJ found plaintiff unable to perform any past relevant work. (Tr. 42.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Id.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an

individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or medically equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its medical equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by (1) improperly characterizing plaintiff's impairments of depression and knee pain as non-severe, (2) failing to properly develop the record, and (3) failing to have a vocational expert testify at plaintiff's hearing.

### A. Determination of Non-Severity

Plaintiff argues that the ALJ erred by improperly characterizing plaintiff's impairments of depression and knee pain as non-severe. A severe impairment is defined as an impairment that significantly limits one's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If the ALJ finds any severe impairments, the ALJ must continue the sequential analysis and address the limiting effect of all claimant's impairments in the RFC determination. 20 C.F.R. § 404.1545. If the ALJ considers the challenged impairment in the RFC determination,

the failure to find the impairment severe is harmless error. Swartz v. Barnhart, 188 F. App'x 361, 368 (6th Cir. 2006); see also Dewey v. Astrue, 509 F.3d 447, 449-50 (8th Cir. 2007); Van Vickle v. Astrue, 539 F.3d 825, 830-31 (8th Cir. 2008).

The fact that the ALJ considered plaintiff's difficulties lifting, standing, and walking, and joint pain in the RFC determination is controlling. (Tr. 39-41.) Therefore, even assuming the ALJ erred in his determination that plaintiff's knee pain is non-severe, such error is harmless.

Additionally, substantial evidence supports the ALJ's finding that plaintiff's depression is non-severe. In determining whether a claimant's mental impairments are severe, the ALJ must "consider four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitations: [a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). Further, the regulations state:

> If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.

Id. §§ 404.1520a(d)(1), 416.920a(d)(1); see Buckner v. Astrue, 646 F.3d 549, 556-57 (8th Cir. 2011). Here, Dr. Brandhorst, a licensed psychologist, concluded in her report that plaintiff's depression did not restrict his activities of daily living; mildly limited his ability to maintain social functioning; mildly limited his ability to maintain concentration, persistence, or pace; and did not result in any episodes of decompensation. (Tr. 348.) As a result, the ALJ found that plaintiff's mental impairment "causes no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area," and is thus non-severe. (Tr. 39.)

Dr. Brandhorst's assessment was based in part on the mistaken belief that plaintiff had not been hospitalized for depression. (Tr. 456-64.) However, additional evidence supports the ALJ's conclusion that plaintiff's depression was non-severe. "That a physician did not submit . . . a medical conclusion that [the claimant] is disabled and unable to perform any type of work is a significant factor for the ALJ to consider." Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000). Failure to seek ongoing medical treatment is a factor an ALJ may consider to assess credibility.

Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010). However, inability to pay can justify a claimant's failure to seek medical treatment. Vasey v. Astrue, 2009 WL 4730688 at *5 (E.D. Ark. 2009).

None of plaintiff's treating health care providers determined that plaintiff had any mental work-related functional limitations. (Tr. 39.) Further, after his 2005 hospitalization, the medical records only mention his depression twice. (Tr. 300, 318.) Both times he received prescriptions and issued no complaints afterwards, indicating that his depression can be controlled with treatment. (Tr. 67, 299, 300, 318.); Thomas v. Barnhart, 130 F. App'x 62, 63 (8th Cir. 2005); Jones v. Astrue, 619 F.3d 963, 971 (8th Cir. 2010); Roe v. Chater, 92 F.3d 672, 677 (8th Cir. 1996); Johnson v. Astrue, 628 F.3d 991, 995 (8th Cir. 2011). Also, while plaintiff stated that he could not seek consistent treatment for his depression due to lack of funds, his medical records show that he continued to spend money on cigarettes and alcohol, indicating that he used any available funds for activities other than care for his depression. (Tr. 297-98, 299, 300, 301, 302, 308, 318, 351-55, 372-76, 382-87, 456-64.)

Therefore, substantial evidence supports the ALJ's conclusion of non-severity regarding plaintiff's depression.

**B. ALJ's Duty to Develop the Record**

Plaintiff next argues that the ALJ erred by failing to properly develop the record as to plaintiff's depression, knee pain, and shoulder pain. The ALJ has a duty to develop the evidentiary record fairly and fully. Byes v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012); however, the plaintiff has the ultimate burden of producing evidence to support his claim of disability. See Pates-Fire, 564 F.3d at 942 (8th Cir. 2009). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." Mouser v. Astrue, 545 F.3d 634, 639 (8th Cir. 2008).

The ALJ concluded that plaintiff's depression was non-severe in part because of a lack of support from the medical record. (Tr. 38-39.) Subsequent to the ALJ's decision, plaintiff submitted additional evidence supporting his allegations that his depression was severe to the

Appeals Council. (Tr. 456-64.) "When the Appeals Council has considered new and material evidence and declined review, we must decide whether the ALJ's decision is supported by substantial evidence in the whole record, including the new evidence." Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000). The Appeals Council considered the later submitted evidence. (Tr. 1-4.)

Plaintiff submitted evidence that he had been hospitalized at Community Health Network Hospital in Indiana following an altercation with his brother, and diagnosed with major depressive disorder. (Tr. 456-64.) The ALJ's decision, however, was not based only on the lack of evidence in the record at the time of the hearing indicating hospitalization for depression. The medical record demonstrates that plaintiff was diagnosed with depression on two occasions, after both of which times he was prescribed Pristiq and Cymbalta, respectively. (Tr. 67, 299, 300, 318.) Further, the medical record also indicates that none of plaintiff's health care providers assessed any mental work-related functional limitations. (Tr. 39.) Therefore, the ALJ did not fail to develop the record fully and fairly concerning plaintiff's depression.

Plaintiff argues that the ALJ failed to develop the record when he did not inquire further following plaintiff's testimony concerning his right knee and shoulder pain. In determining whether the ALJ fully and fairly developed the record, the court must consider whether the record contained sufficient evidence for the ALJ to make an informed decision. See Payton v. Shalala, 25 F.3d 684, 686-87 (8th Cir. 1994). The medical records available to the ALJ reveal that in 2000 Dr. Angelicchio of the Sports Medicine Institute of Indiana examined plaintiff's right knee, noting maximum medical improvement and instructing against prolonged periods of squatting, climbing, or kneeling. (Tr. 296.) Additionally, the record at the time of the hearing indicated that plaintiff suffered a torn rotator cuff and muscle atrophy in his right arm. (Tr. 322.) These records sufficiently show that plaintiff did experience pain in his right knee and shoulder and therefore the ALJ did not err in failing to further develop the record.

The record concerning plaintiff's depression and knee and shoulder pain was fully and fairly developed. Accordingly, plaintiff's second argument is without merit.

**C. Vocational Expert**

Plaintiff argues that the ALJ committed reversible error by failing to have a vocational expert (VE) testify at plaintiff's hearing and by relying on the Medical-Vocational Guidelines, 20 C.F.R. Appendix 2 to Subpart P of Part 404 (grids). In order to establish whether there are jobs in the national economy for a person with the plaintiff's characteristics, the ALJ must generally rely on a VE's testimony. Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2011). Reliance on a VE's testimony is required where the claimant suffers from a severe mental impairment. King v. Astrue, 564 F.3d 978, 979 (8th Cir. 2009). However, when a claimant has only exertional impairments, or where the claimant's non-exertional impairments are non-severe and do not diminish his RFC to perform the full range of activities listed in the guidelines, the ALJ may rely on the guidelines to make such a determination. McGeorge v. Barnhart, 321 F.3d 766, 768-69 (8th Cir. 2003); Haley v. Massanari, 258 F.3d 742, 747-48 (8th Cir. 2001).

Plaintiff argues that he suffers from depression and anxiety, and postural limitations, which are non-exertional impairments, and, therefore, the ALJ's reliance on the grids was improper. The ALJ found that plaintiff suffered from depression, but found that it was non-severe. (Tr. 38.) For the reasons set forth above, the conclusion that plaintiff's mental health impairment was non-severe is supported by substantial evidence. This impairment was not a limitation on the use of the grids.

Plaintiff also argues that the findings of Dr. Angelicchio triggered the need for a vocational expert, because they disclosed a non-exertional postural limitation, citing 20 C.F.R. § 404.1569a(c)(1)(vi)(including as an example of a non-exertional limitation or restriction "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching").

Plaintiff points to the report of Dr. Angelicchio, dated June 2, 2000, to establish that he had sufficient postural limitation to qualify as a non-exertional limitation. The undersigned disagrees. Dr. Angelicchio's report was issued seven years before plaintiff's alleged onset of disability. The undersigned concludes that this report indicated that, because it released plaintiff to return to work, the physical limitation described in the report was not severe and did not limit plaintiff from work activity.

For these reasons, the ALJ did not err in relying on the Medical-Vocational Guidelines.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed.

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.


        /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**



Signed on March 21, 2014.